John Camerlengo and Jennie Camerlengo v. Commissioner. Cam Steel Rule Die Works, Inc. v. Commissioner.
Camerlengo v. Commissioner
Docket Nos. 1613-66, 2182-66.
United States Tax Court
T.C. Memo 1968-93; 1968 Tax Ct. Memo LEXIS 203; 27 T.C.M. (CCH) 428; T.C.M. (RIA) 68093; May 22, 1968. Filed *203 The allocation of $160,000 of the total purchase price of $200,000 for a tool and die business to a covenant not to compete was made at arm's length and intended by both parties to the contract, and such allocation shall be upheld and recognized for tax purposes. Arthur L. Feinstein, 2 Park Ave., New York, N. Y., for the petitioners in docket No. 1613-66. Benjamin Jaffe, for the petitioner in docket No. 2182-66. Gerald Backer, for the respondent. 429 DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated cases respondent determined deficiencies in income tax for John and Jennie Camerlengo for the year 1962, in the amount of $22,075.09, and for the year 1963, in the amount of $5,787.10. Respondent also determined deficiencies in corporate income tax for Cam Steel Rule Die Works, Inc., for the taxable period from May 1, 1962, through December 31, 1962, in the amount of $2,799.99, and for the year 1963, in the amount of $4,200. The sole issue for decision with regard to said deficiencies is whether the value placed on a covenant not to compete by written provision in the contract of sale for the transfer of a proprietorship *204 operated by Camerlengo to Cam Steel Rule Die Works, Inc. (hereinafter referred to as Cam Steel, Inc.), should be upheld and recognized for tax purposes. Respondent has assessed a deficiency against Cam Steel, Inc., by disallowing deductions for amortization of the amount allocated to the covenant not to compete, [1] which respondent claims is nonamortizable goodwill. With regard to the seller, respondent has determined that because the proceeds he received are attributable to the covenant not to compete they are taxable as ordinary income. In this proceeding, respondent has remained neutral, and the value which this Court places on the covenant not to compete will determine the tax consequences to the parties: The buyer may amortize that amount and the seller must treat such amount as ordinary income. Findings of Fact Those facts which have been stipulated by the parties are incorporated *205 by this reference. John Camerlengo and Jennie Camerlengo are husband and wife, who resided in Englewood Cliffs, N.J., on the date they filed their petition in this proceeding. Their Federal income tax returns for 1962 and 1963 were filed with the district director in Newark, N.J. Cam Steel Rule Die Works, Inc., had its principal place of business at Little Ferry, N.J., when it filed its petition in this proceeding; it filed its Federal corporate income tax returns for the periods in question with the district director in Newark, N.J.
Petitioner Camerlengo operated Cam Steel Rule Die Works as a proprietorship from 1945 until May of 1962. The business manufactured dies for the corrugated box industry, and because of the difficulty of finding skilled men to serve in such business, there was little competition in the New Jersey-New York area. Camerlengo had taught the particular skills in the business to his three most important employees: Bernard Roth, his brother-in-law; Anthony Polio, another brother-in-law; and Fred Galiardo, Jr., his nephew. In 1962, Camerlengo was a man of 55 and in good health, but had worked all his life. The gross receipts of his business were about $150,000 *206 per year, from which the net income was approximately $50,000 annually. He felt that he had developed a profitable business which he could sell and retire on the proceeds therefrom. From the time Camerlengo began his business, he had known John Rosa, who worked for Industrial Container Corporation. In 1962, Rosa was the superintendent of that company. Industrial was Camerlengo's largest single customer at this time and John Rosa and Camerlengo dealt frequently on both a business and social level. Camerlengo had expressed some interest in selling his business to Rosa, who indicated that he would like to invest in a venture which would provide opportunities for his son, Edward, and his son-in-law, Joseph Ferrigno. Camerlengo indicated that $250,000 would be a fair price for a business that netted $50,000 per year. Rosa offered $200,000, partly because there were no patents or copyrights involved in the business which had depended mainly on Camerlengo's own skill. Initially the parties agreed on a cash payment of $40,000 and an installment method for the payment of the balance. Their lawyers were to proceed from this point. The first step was taken by Camerlengo's lawyer, George *207 Kedersha, who prepared a proposed contract of sale. Kedersha suggested including in the contract a covenant not to compete for a period of 5 years. Camerlengo indicated that 10 years would be better, because he did not intend to return to business. The first version of the contract was dated March 1962, and included a covenant not to compete for 10 years which covered New Jersey. Said contract was reviewed at a meeting held in the office 430 of Benjamin Jaffe, the attorney for John Rosa. Also present were the Rosas, Kedersha, Camerlengo, and the Rosas' accountant, Vincent Comperatore. The discussion centered around extending the covenant not to compete to New York and the allocation of the purchase price to various items in the business, including the covenant not to compete. With regard to such allocation, Jaffe and Comperatore felt that in order to generate enough cash to pay for the business, the purchasers would have to be able to amortize a large amount for the covenant not to compete for purposes of tax savings. The meeting concluded with Jaffe receiving instructions from both sides to amend the proposed contract to account for the extension of the covenant to New York *208 and to add the allocation. Comperatore thereupon computed an amount of $160,000 for the covenant. He arrived at this figure by valuing the other assets of the business. The tangible assets were given a $12,000 value, and the value of the goodwill based upon a net profit of $50,000 with a deduction of $26,000 for salaries for Edward Rosa and Ferrigno, amortization of the covenant not to compete, Federal income tax, and a return of $2,400 on the $40,000 which the older Rosa was putting into the business (computed at 6 percent of the investment). The resulting net figure of $4,425 was multiplied by a factor of seven for the type of business, and $28,000 was allocated to goodwill. The Rosas felt very strongly about the allocation of such a large amount to the covenant not to compete, because Comperatore had advised them that it might be more preferable to start their own business than to purchase from Camerlengo. In addition, Rosa did not wish to compete with Camerlengo because of the effect of a potential price war on their friendship and respective businesses. Consequently, in talking to Kedersha, Jaffe advised him that the allocation was essential, and that Camerlengo must agree *209 to this in order for negotiations to be completed. At a meeting in Jaffe's office, about April 4, 1962, where the Rosas, Camerlengo, Kedersha, and possibly Comperatore were present, Camerlengo first became aware of the Rosas' insistence on the allocation. Camerlengo was uncertain about the reason for this, and he was told by Kedersha, after the lawyer discussed the matter with Jaffe, that he would still be getting $200,000 and possibly that there were no unfavorable tax effects on him. Kedersha was not aware that the allocation might affect his client unfavorably taxwise. The final contract was sent to Jaffe by Kedersha on April 5, 1962, and was executed by Edward Rosa and Camerlengo at the latter's shop in New Jersey on April 12, 1962. Unlike the original proposed contract of March 1962, the contract extended the covenant not to compete to New York and contained the allocation of the purchase price, and the requirement that Camerlengo establish a separate fund of $8,000 for the benefit of key employees. In view of the importance of the covenant not to compete in this proceeding, it is set out below: 8. The Bill of Sale shall contain a covenant that the Seller will not re-establish, *210 re-open, become engaged, employed or in any other manner whatsoever interested, directly or indirectly, in the same, or similar business, throughout the State of New York & New Jersey, for a period of ten (10) years from date thereof, unless there should be a default by the Purchaser and in which event the Seller reserves the right to resume operation in the same business and at such location as he may select. The Seller hereby agrees that he will set aside a sum of Eight Thousand ($8,000.00) Dollars which will be kept as a separate fund to be paid to the three top key-men, namely, Bernard Roth, $5,000.00, Anthony Polio, $2,000.00, Fred Galiardo, Jr., $1,000.00, provided they remain in the employ of the Purchaser for a period of five (5) years from date of passing of title. The money is to be allocated as a bonus to the three key-men on the basis of seniority. In the event any of the three key-men leave the employ of the Purchaser of their own accord or discharged for cause, before the expiration of five year period the Seller may withdraw from the funds the amount mentioned above for the employee terminating his services and the balance may be distributed to the remaining employees *211 or employer in such amounts as the Seller should elect at the end of the five year period. Of further significance is the fund of $8,000 set aside for key employees which is set out above. Such fund was primarily to protect the purchaser from resignations of key employees who were transferred from Camerlengo. Set out also, is the allocation of the $200,000 purchase price: 431 2. The full purchase price is Two Hundred Thousand ($200,000.00) Dollars and said purchase price is made up as follows. Twelve Thousand ($12,000.00) Dollars represents the value of the goods and chattels. Twenty Eight [sic] ($28,000.00) Dollars represents the good will of the business. One Hundred Sixty Thousand ($160,000.00) Dollars is in payment of the restrictive covenant as contained in paragraph 8 of this Agreement. Prior to May 1, 1962, the Rosas and Ferrigno organized Cam Steel Rule Die Works, Inc., with one-third of the stock owned by each. Edward Rosa assigned his interest in the April 12, 1962, contract to Cam Steel, Inc., which assumed his obligations. On May 1, 1962, Camerlengo executed a bill of sale to Cam Steel, Inc., which recited the sale of the steel rule die making business, *212 customer accounts, and goodwill to Cam Steel, Inc. The list of customer accounts totaled 26. Soon thereafter, Bernard Roth and Anthony Polio indicated their plans to leave Cam Steel, Inc., and open their own competing business. Rosa offered these men a dollar an hour increase, a minimum annual bonus of $1,000, and certain fringe benefits. These were accepted. Because of this added expense, Rosa requested that Camerlengo reduce the sales price by $25,000. On July 18, 1962, an agreement was signed to this effect. In its corporate tax returns for 1962 and 1963, Cam Steel, Inc., claimed deductions for amortization of the covenant based on a cost of $160,000. Prior to this proceeding, such cost basis was reduced to $140,000, at the urging of a revenue agent, to reflect, pro rata, the reduction in the purchase price of the business (80 percent of $25,000). Cam Steel, Inc., agreed to this adjustment and paid the additional tax due as a result thereof. In this proceeding respondent has disallowed any deduction for amortization of the amount allocated to the covenant not to compete. In 1962, Camerlengo received $51,303.04 from Cam Steel, Inc., and in 1963, he received $24,414.06. All *213 of such amounts were reported by him as income from the sale of capital assets. Respondent has determined that 80 percent of these amounts ($160,000/$200,000) is ordinary income in respect of the covenant. Ultimate Finding of Fact The allocation made to the covenant not to compete in the contract for the sale of the proprietorship known as Cam Steel Rule Die Works was knowingly and willingly made and was intended by the parties to the contract and represents their agreement. Opinion We have before us a question which has been before this Court on many prior occasions: Whether the allocation of part of the purchase price of a business to a covenant not to compete specifically made in the contract of sale, should be recognized for tax purposes or whether the covenant not to compete is a nonseverable part of the goodwill transferred so that the allocation to the covenant is to be ignored. The tax implications are that if the covenant is really another name for goodwill, the purchaser may not amortize such item; but the seller may treat the proceeds thereof as the sale of a capital asset. If the allocation is upheld, then the purchaser can amortize that amount and the seller must *214 treat the proceeds thereof as ordinary income. (C.A. 2), affirming . The seller, Camerlengo, contends strenuously that he did not intend such allocation to be made, because he was not aware of the tax consequences; furthermore, he argues that such allocation does not reflect a proper recognition of the value of the goodwill of the business. The purchaser, Rosa, on the other hand, demonstrates that there was much reason to fear competition from the seller, that the negotiations were at arm's length, and the parties and their respective counsel agreed to the allocation. This Court has held repeatedly that a covenant not to compete has to have some independent significance in order to value it separately from goodwill. An allocation of an amount of the proceeds from the sale of a business to such a covenant must be made willingly and knowingly. , affd. (C.A. 10); ; . However, as stated in : *215 when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong 432 proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money. We said in : The nub of the question is whether the covenant not to compete was actually dealt with as a separate item in the transaction and, if it was, how much was paid for it. * * * Where the dispute is between the parties to the agreement themselves, and it is apparent that the provision for the covenant not to compete was agreed upon by both parties with a full understanding of the implications thereof, the Courts are reluctant to go beyond the terms of the agreement. * * * The majority of the Court of Appeals for the Third Circuit (wherein this case arose), in , in reversing this Court, *216 went so far as to hold that a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing admissible proof which would show the unenforceability of the agreement because of "mistake, undue influence, fraud, duress, etc." The parties here negotiated for the sale of the business at arm's length. There were preliminary negotiations between Rosa, Sr., and Camerlengo, wherein Camerlengo suggested a price for the business of $250,000, but a final price of $200,000 was agreed upon. At this stage there was apparently no effort to allocate the agreed-upon price among any of the assets being sold. Camerlengo's attorney was then instructed to draft an agreement, which he did. This agreement contained a possibly "boiler plate" covenant not to compete clause in it. This draft was not satisfactory to Rosa's attorney, who suggested various changes, including the allocations contained in the final draft of the agreement. There appear to have been two meetings between the parties in the presence of their attorneys, at one of which Camerlengo himself raised a question about the allocation of the purchase price. At no time were any complaints made about *217 the manner in which the purchase price was allocated to the assets of the business. Camerlengo does not now claim that he did not agree to the allocation; only that he did not recognize the tax implications. It was the responsibility of both parties, with the assistance of their attorneys, to be aware of the significance of the various aspects of the contract. In (C.A. 10), affirming , the Court of Appeals said, at page 765: the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. The proposed change in the contract was clear. All parties participating in the conference agreed to it. * * * It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. * * * See also The covenant not to compete had significance *218 of its own. We are not faced with a case like that of , affd. (C.A. 9), where the seller did not have the ability to compete with the purchaser. Camerlengo was a man of 55 years, in good health, and highly skilled in a business where there were few men as capable. He had trained his principal employees in the trade, and it was these men who became employees of Cam Steel, Inc., after the sale of the business. Camerlengo agreed to put aside a fund of $8,000 to provide bonuses for three of these employees at the end of their fifth year with the new corporation. He agreed to accept a $25,000 reduction in the selling price of the business, because two of his former employees indicated to the Rosas their interest in opening a competing business unless their salaries were increased. Camerlengo had indicated to Rosa, Sr., his desire to open a trade school where he could pass on his skill in the business to other persons. He changed his mind when he was informed how detrimental it would be to the new corporation, because graduates of such a school would be able to compete with Cam Steel, Inc. In contrast to the large value *219 of the covenant not to compete, the goodwill of the business had little value. Rosa, Sr., was superintendent of the largest customer of Camerlengo. Therefore, Cam Steel, Inc.'s 433 principal worry about obtaining customers was whether it could manufacture at satisfactory prices and not whether it could obtain customers. The risk of a price war on Rosa's friendship with Camerlengo prevented Rosa from starting a new business. The contract of sale was not made in order to obtain customer lists. As previously stated, we are aware of the strict rule adopted by the majority of the Court of Appeals for the Third Circuit in , that a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing admissible proof which would show the unenforceability of the agreement because of "mistake, undue influence, fraud, duress, etc." And we are also aware that it goes beyond the less stringent "strong proof" rule of this Court and other Courts of Appeals. See ; ; ; , *220 affirmed on this issue (C.A. 5); , affd. (C.A. 6); and (C.A. 9). Having found that the amount allocated to the covenant not to compete reflects the intentions of the parties and was realistically bargained for, it follows that Camerlengo has not presented the "strong proof" necessary to establish that the allocation to the covenant did not reflect the substance of the agreement entered into by him and Rosa. A fortiori, Camerlengo cannot prevail under the more rigid rule of the Third Circuit because there is obviously an absence of fraud or duress. Accordingly, we hold for petitioner in Cam Steel, Inc., and against petitioner Camerlengo. Decision will be entered for the respondent in docket No. 1613-66. Decision will be entered for the petitioner in docket No. 2182-66. Footnotes
1. The buyer now concedes that the maximum amount that should be allocated to the covenant not to compete is $140,000. This amount equals the original $160,000 allocated to the covenant less $20,000 of the $25,000 reduction in the total purchase price which was agreed to by the parties.↩